[No. 46016.   En Banc.   September 6, 1979.]

*In the Matter of the Personal Restraint of*
DENNIS SINKA, *Petitioner.*

*In the Matter of the Personal Restraint of*
JODY JOHN ROWE, *Petitioner.*

---

*Wayne Lieb, Sally Harrison,* and *Robert Adelman* of *Institutional Legal Services,* for petitioners.

*Slade Gorton, Attorney General,* and *Nate D. Manna-kee, Assistant,* for respondent.

*David F. Stobaugh* and *Stephen Strong* on behalf of the American Civil Liberties Union, amici curiae.

BRACHTENBACH, J.—Two prison inmates, Sinka and Rowe, by personal restraint petitions present the issue whether they are entitled to procedural due process in the setting of their minimum prison terms by the Board of Prison Terms and Paroles (Parole Board). We hold that petitioners are entitled to minimal due process and that the

procedures used by the Parole Board to set minimum terms generally provide the process due.

## I

Petitioner Sinka pleaded guilty to a charge of carnal knowledge of his stepdaughter and was sentenced by the trial court to a 20–year maximum term. The sentencing judge recommended an 18–month minimum term, and the prosecutor recommended a 3–year minimum term. Under Parole Board guidelines, Sinka was in the category of offenders normally receiving a minimum term of 18 to 24 months.

To have his minimum term set, Sinka met alone with two members of the Parole Board in September 1977. Sinka did not have access to his Parole Board file.

After the meeting, the Board decided to exceed the recommendations and the guideline terms and set Sinka's minimum at 15 years. It gave these written reasons for its decision:

> Mr. Sinka is here for the crime of Carnal Knowledge which involved the forcible rape of his fourteen year old stepdaughter. File material and admissions from Mr. Sinka indicate that not only at the time he was having relations with his stepdaughter, he was also having relations with his wife and also with one of his stepdaughter's girlfriends. Mr. Sinka admits that he is the father of at least four children by four different women, mostly juveniles. He indicates to the panel that he is from Alaska and that he thought that was all right, that as long as they wanted to play that they could play. It was the panel's feeling that there is sufficient evidence in the file that he did use force in these assaults and there's also information in the file that he possibly assaulted another minor and by his own admission, a couple of other young ladies. It is hoped that the panel that sees him in July of 1979 does not consider any substantial cut.

The facts recited by the Board in its decision come primarily from a parole officer's presentence report to the trial court. Pursuant to CrR 7.2(c), the report was disclosed to

Sinka before the trial court imposed the maximum term. Sinka's attorney presented the trial court with a memorandum challenging the report's accuracy. Although the Parole Board file on Sinka included the presentence report, it is unclear whether the file also contained the memo of Sinka's lawyer.

Upon receiving news of his 15–year minimum term, Sinka complained to the Parole Board that it had relied on misinformation. He submitted affidavits controverting a number of the facts recited in the Board's written decision. He requested access to his file and redetermination of his minimum term.

The Parole Board did not respond and Sinka filed this personal restraint petition. He asks for a new minimum term hearing and an opportunity to review his parole file. His appearance before the Parole Board for a "progress hearing" was scheduled for July 1979.

Petitioner Rowe pleaded guilty to a second–degree murder charge and was sentenced by the trial court to a maximum 20–year term. The sentencing judge recommended that Rowe be considered for intensive parole rather than a minimum term; the prosecutor recommended a 7 1/2–year minimum term. Under Board guidelines, Rowe apparently was in the category of offenders normally receiving a minimum term of 6 to 8 years.

Rowe met alone with two Board members in May 1977 for setting of his minimum term. He did not have access to his file.

After the meeting, the Board went outside the recommended and guideline ranges and sentenced him to a 10–year minimum. Its written reason for this decision states:

> This was a tavern beef that finally went outside and then there another guy asked him for a cigarette and there were some more words. Finally, the other guy challenged him to a fight and Rowe pulled out a .45 and shot him and he died. Rowe claims that the other guy was attacking him. He drew the gun, shot and ran and says that he doesn't know why, other than he was using alco-

hol and drugs at the time. He's a high school graduate with a couple of years of college. He's been drinking and using drugs and under a doctor's care some two years ago for emotional problems. He's 22, and while this is his first felony conviction, the file reflects that there have been felonies both as an adult and a juvenile. It is clear that he was using and abusing alcohol, and poly-drugs at the time and did own and carry the .45. It seems he slowly but surely kept getting himself more involved in a non-conformist and rebellious position. He shows shame and remorse.

Upon learning of his 10-year minimum term, Rowe filed this personal restraint petition. He says that he was never convicted of, nor is guilty of any other crimes besides his second-degree murder conviction. Therefore, he claims, the Board was misinformed in setting his minimum term on the basis that "the file reflects that there have been felonies both as an adult and a juvenile."

As relief, Rowe requests: (1) a new minimum term hearing; (2) advance notice of disputed factual issues; (3) assistance of counsel; (4) right to present witnesses and evidence; (5) right to cross-examination; and (6) a statement of reasons for factual conclusions reached at the new minimum term hearing.

Since filing his personal restraint petition, Rowe met in February 1979 with the Parole Board for a "progress hearing." The Board did not reduce his minimum term.

## II

We now consider the procedures used by the Parole Board to set minimum terms. RCW 9.95 is the Washington prison terms, paroles and probation act and provides a structure for modified indeterminate sentencing. *See generally* Meyerson, *The Board of Prison Terms and Paroles and Indeterminate Sentencing: A Critique,* 51 Wash. L. Rev. 617 (1976); Johnson, *The Board of Prison Terms and Paroles: Criteria in Decision Making,* 51 Wash. L. Rev. 643 (1976); Comment, *A Perspective on Adult Corrections in Washington,* 51 Wash. L. Rev. 495 (1976).

When a person is convicted of a felony, the trial court must sentence the person to the *maximum* statutory term. RCW 9.95.010. Then, within 6 months of the person's admission to prison, the Parole Board sets the *minimum* term. RCW 9.95.040.

To assist the Parole Board in setting a minimum term, the sentencing judge and the prosecuting attorney provide the Board with recommendations for a minimum term and with a "statement of all the facts concerning the convicted person's crime and any other information . . . relative to him." RCW 9.95.030. In addition, the prosecutor provides the Parole Board with a statement about the convicted person's earlier career, character and capability of again becoming a good citizen; a copy of the statement is provided to the inmate. RCW 9.95.031; .032.

In making its minimum term decision, the Board considers the statements it receives from the judge and prosecutor, and any other information about the "convict as a personality." RCW 9.95.030; .170. *See In re Wyback v. Board of Prison Terms & Paroles,* 32 Wn.2d 780, 783, 203 P.2d 1083 (1949). It then sets the minimum term, which may not exceed the maximum statutory term. RCW 9.95-.040. The Board may later reduce or increase a minimum term depending on the inmate's behavior and obeyance of prison rules. RCW 9.95.052; .080.

Upon completion of an inmate's minimum term (less time for good behavior), the Board may parole the inmate. RCW 9.95.110. A parole interview is held to determine whether the inmate should be released. Parole may be revoked if the parolee breaches a condition of release. RCW 9.95.120. *See Monohan v. Burdman,* 84 Wn.2d 922, 930, 530 P.2d 334 (1975).

The Board is authorized to promulgate rules to carry out the provisions of the act. RCW 9.95.150. The Board, however, is exempt from the Washington administrative procedures act and its rules are not published in the Washington Administrative Code. RCW 34.04.040; .050; .150. *See In re George,* 90 Wn.2d 90, 98 n.2, 579 P.2d 354 (1978).

Chapter 5 of the Board's Rules of Practice and Procedure (1971) regulates the setting of minimum terms. Board Rule 5.121 (1976) establishes guidelines for fixing of minimum terms based on the crime's seriousness and an inmate's "parole success probability." This probability is derived from a formula which considers type of crime, marital status, alcohol use, juvenile institutionalization and prior parole record. The rule requires the Board to provide the inmate with written reasons whenever it sets a minimum term outside the guideline ranges. This rule was in effect when petitioners Sinka and Rowe received their minimum terms.

Board Rule 5.121, however, was amended in 1978. The new rule derives minimum terms from a formula which weighs felony classes, aggravating circumstances and prior criminal record. Like the old rule, new Rule 5.121 requires the Board to give written reasons when it sets minimum terms outside the guideline ranges. The Board in January 1979 prepared a standardized form that lists 42 reasons for decisions outside the guidelines.

The actual setting of a minimum term occurs at a meeting between the inmate and a 2–person panel of the Parole Board; that meeting averages 15 to 20 minutes in length. Board Rule 5.100; *see generally* American Friends Serv. Comm., *AFSC Study of the Washington Board of Prison Terms and Paroles* 7–8 (1977). The inmate meets alone with the panel; counsel, family and friends are not allowed to attend. Board Rule 5.110. The Board, however, accepts written statements on behalf of the inmate. Board Rule 5.090.

The panel asks the inmate about charges and information in his or her Parole Board file. The inmate, however, is not permitted to see the file.

The inmate is excused while the panel deliberates and then is recalled to hear the panel's decision. If the panel decides to set the inmate's minimum term outside the guideline ranges, it sends the inmate a written "Decision and Reasons" within a few weeks.

When the Board sets the minimum term, it also fixes a tentative release date which anticipates a one–third reduction in the minimum term for good behavior. Board Rule 5.160. The Board also then sets the date for the inmate's next "progress hearing." The purpose of the hearing is to reconsider the inmate's minimum term. The "progress hearing" is scheduled for 14 to 24 months after the initial hearing depending on the length of the original minimum term. If the original minimum term is 2 1/2 years or less, no "progress hearing" is scheduled. Board Rule 5.170 (1977).

Although not challenged here, chapter 7 of the Board's Rules of Practice and Procedure (1979) regulates the setting of the actual parole release date. Board Rule 7.050 (1979) establishes guidelines for modifying minimum terms set under Board Rule 5.121. The guidelines use probability formulae about parole performance for various groups of offenders to determine reductions in length of confinement. A parole meeting is held between the Board and the inmate to determine whether to grant the guideline adjustment and to facilitate the inmate's prison release. Reasons are given when the guidelines are exceeded.

### III

Before ascertaining what process is due Sinka and Rowe at the settings of their minimum terms, we must first determine whether due process applies.

Although they are in legal custody under valid convictions, Sinka and Rowe still possess a residuum of constitutionally protected liberty. *See Morrissey v. Brewer,* 408 U.S. 471, 482, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972); *Meachum v. Fano,* 427 U.S. 215, 232, 49 L. Ed. 2d 451, 96 S. Ct. 2532 (1976) (Stevens, J., dissenting).

> [T]hough [their] rights may be diminished by the needs and exigencies of the institutional environment, [they are] not wholly stripped of constitutional protections when . . . imprisoned for crime.

*Wolff v. McDonnell,* 418 U.S. 539, 555, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974).

■ Although they are prisoners, Sinka and Rowe may still claim protection of the Fourteenth Amendment's due process clause. *Wolff v. McDonnell, supra* at 556. It applies when government action deprives them of liberty or property. *Haines v. Kerner,* 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972) (per curiam). Accordingly, we must inquire whether petitioners have a "liberty interest" in the setting of their minimum terms. *See Monohan v. Burdman,* 84 Wn.2d 922, 927, 530 P.2d 334 (1975).

A protected liberty interest may be created by the constitution, by statute, or by administrative regulation. *See generally* Project, *Eighth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1977–1978,* 67 Geo. L.J. 317, 668–70 (1978); Note, *Due Process and the Parole Release Decision,* 66 Ky. L. Rev. 405, 407–11 (1977).

In *Morrissey v. Brewer, supra* at 482, the United States Supreme Court ruled that the constitution protected the liberty of a parolee from unchecked revocation. We agreed in *In re Akridge,* 90 Wn.2d 350, 353, 581 P.2d 1050 (1978).

In *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex,* 442 U.S. 1, 60 L. Ed. 2d 668, 99 S. Ct. 2100, 2106 (1979), the United States Supreme Court ruled that a Nebraska parole statute created a liberty interest for prisoners in their parole releases. Similarly, in *Wolff v. McDonnell, supra* at 547–52, 556–57, that court ruled that a Nebraska statute and its accompanying prison regulations created a liberty interest for prisoners in good time credits. Likewise, prison policy statements that imposed punishment only for major misconduct created a liberty interest for prisoners in *Walker v. Hughes,* 558 F.2d 1247, 1255–56 (6th Cir. 1977).

■ In *Monohan v. Burdman, supra* at 927–28, we held that this state's system of fixing in advance a tentative parole release date created a constitutionally protected "potential conditional liberty" for prisoners. Our ruling

recognized at page 928 that prisoners justifiably relied on the prefixed release dates, so long as they abided by the conditions of incarceration.

We believe that a liberty interest is created here by the statute and the regulations that direct the setting of minimum terms. In particular, we believe that prisoners may justifiably rely on the Parole Board's following of its guidelines when setting minimum terms. Although the constitution does not guarantee the availability of the guidelines, the Board itself created them and the expectation that they will be followed. Moreover, the Board recognizes that, when this expectation is disappointed by the setting of a term outside the guidelines, written reasons must be provided. *See Wolff v. McDonnell, supra* at 557; *Monohan v. Burdman, supra* at 928.

The Board recognizes that, in adopting the guidelines, it established "an explicit policy in decision making . . . to insure that similar persons are dealt with in similar ways in similar situations." The policy "enables and encourages the concept of fairness and equity through similarity and ability to compare similar cases." Washington Human Resources Agencies, Annual Report 57 (1977); *see* Washington Human Resources Agencies, Annual Report 53 (1978).

Implicit in this policy is the notion that a prisoner's minimum term will be set according to guidelines as long as the prisoner's case is not extraordinary. Thus, the Board's first step in a decision to go outside the guidelines seems to involve a retrospective factual determination that a prisoner's past behavior differentiates him or her from other similarly situated inmates. The second step, which arises only if it is determined that the prisoner is different, involves the application of the Board's expertise in setting a minimum term outside the customary range. This second step is not purely factual, but also predictive and discretionary. *See Morrissey v. Brewer, supra* at 479–80; *Monohan v. Burdman, supra* at 928. *But cf. Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex, supra* at

2105 (parole release involves many purely subjective appraisals by Parole Board). We believe these factual considerations deserve minimum due process procedural safeguards.

## IV

We now turn to the nature of the process that is due at the setting of minimum terms. The essentials of due process are "notice and an opportunity to be heard or defend before a competent tribunal in an orderly proceeding adapted to the nature of the case." *In re Hendrickson,* 12 Wn.2d 600, 606, 123 P.2d 322 (1942); *see Diedrick v. School Dist. 81,* 87 Wn.2d 598, 606, 555 P.2d 825 (1976). We emphasize, however, that due process "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer, supra* at 481, *cited with approval in Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex, supra* at 2106; *see In re Akridge, supra* at 353.

Three factors are considered in determining the specific dictates of due process:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1975), *cited with approval in Mackey v. Montrym,* 443 U.S. 1, 61 L. Ed. 2d 321, 99 S. Ct. 2612 (1979).

As noted above, the private interest affected is petitioners' liberty interest in the setting of their minimum terms. The procedure currently used by the Parole Board to set minimum terms generally safeguards this interest. The Board's procedure affords an inmate an opportunity to be heard. It relies on standardized guidelines and informs an

inmate of the reasons for his or her minimum term when outside the guideline range. In sum, the setting of a minimum term is not part of a criminal prosecution and the full panoply of rights due a defendant in such a proceeding does not apply to a minimum term setting. *See Wolff v. McDonnell, supra* at 556; *Morrissey v. Brewer, supra* at 480.

We are concerned, however, that under its current procedure the Board may set minimum terms based on misleading or erroneous file information. Both petitioners complain that the Board's decision to set their terms outside the guideline ranges resulted from inaccuracies in their Parole Board files. The record before us lends some credence to this claim. *Cf. Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex, supra* at 2108 n.7 (file inaccuracies and access to files were not issues before the court).

Moreover, we are concerned that minimum terms set within guideline ranges may also be based on inaccurate file information. Under the new 1978 guidelines, a base time for length of confinement is assigned to each felony class. The length of confinement then is increased due to "aggravating circumstances." The Board's finding of these circumstances involves a factual determination from an inmate's file about such things as whether the inmate had an opportunity for forethought; age and vulnerability of the victim; whether force was used; whether the victim was sexually abused and type of sexual abuse; and whether the victim was kidnapped. *See* Board Rule 5.121 (Appendix I) (Tables 2A and 2C Glossaries B and C (1978)). If an inmate's file data is erroneous, then the Board's finding of "aggravating circumstances" thereon may likewise be erroneous.

A Parole Board file contains some documents which already are known to an inmate; it also contains documents of which the inmate has no knowledge. The file includes copies of a presentence investigation report and of a prosecutor's statement. Pursuant to CrR 7.2(c)(1), the inmate is shown a copy of the presentence investigation report before

the sentencing judge imposes the maximum term. Pursuant to RCW 9.95.032, the inmate is given a copy of the prosecutor's statement when he or she is committed to prison.

However, a Parole Board file may contain other information never disclosed to an inmate. RCW 9.95.170 requires the Board "not only . . . to thoroughly inform itself as to the facts of [a] convicted person's crime but also to inform itself as thoroughly as possible as to such convict as a personality." It also directs penal institutions to make available to the Board "on request its case investigations, any file or other record". Accordingly, a Parole Board file may include psychological and psychiatric reports; information about any previous periods spent on parole or probation; reports of arrests and juvenile proceedings; and prison conduct reports. *See AFSC Study of the Washington Board of Prison Terms and Paroles, supra* at 26; *Williams v. Missouri Bd. of Probation & Parole,* 585 F.2d 922, 925 (8th Cir. 1978); *vacated* 442 U.S. 926, 61 L. Ed. 2d 293, 99 S. Ct. 2853 (1979).

Considering the variety of documents in an inmate's file, it is conceivable that the file may contain erroneous information. Because data collection by penal institutions and the Parole Board may not be uniform, and because reports prepared for the Parole Board may frequently record the subjective impressions of caseworkers, the documents that are filed may often be misleading or inaccurate. *See Hearings on H.R. 13118 Before a Subcomm. of the House Comm. on the Judiciary,* 92d Cong., 2d Sess., ser. 15, pt. 7, at 451–52, 460, 464 (1972) (testimony of Professor Willard Gaylin, Columbia University Law School); W. Parker, *Parole: Origins, Development, Current Practices and Statutes* 11 (rev. ed. 1975); Note, *Procedural Due Process in Parole Release Proceedings—Existing Rules, Recent Court Decisions, and Experience in the Prison,* 60 Minn. L. Rev. 341, 362 nn. 112–13 (1976). Courts in other jurisdictions have recognized the possibility of such inaccuracies in Parole Board files. *See Williams v. Missouri Bd. of Probation & Parole, supra* at 925; *Franklin v. Shields,* 569 F.2d

784, 794–95 (4th Cir. 1977), *aff'd in part and rev'd in part,* 569 F.2d 800 (4th Cir. 1978) (per curiam) (en banc), *cert. denied,* 435 U.S. 1003, 56 L. Ed. 2d 92, 98 S. Ct. 1659 (1978); *Coralluzzo v. New York State Parole Bd.,* 566 F.2d 375, 380 (2d Cir. 1977), *cert. dismissed,* 435 U.S. 912, 55 L. Ed. 2d 503, 98 S. Ct. 1464 (1978); *see generally* Note, *Prisoner Access to Parole Files: A Due Process Analysis,* 47 Fordham L. Rev. 260, 261 n.12, 272 n.93 (1978). In addition to the allegations of petitioners, there is some evidence that Parole Board files in this state may likewise occasionally include misinformation. *See AFSC Study of the Washington State Board of Prison Terms and Paroles, supra* at 26–28.

We believe that "[s]ince the data on which the Board acts is not developed through an open adversary confrontation, its accuracy cannot be assured unless the prisoner has access to the relevant information in his file." *Franklin v. Shields, supra* at 794–95. Both the inmate and the State have an interest in ensuring that the setting of minimum terms is based on accurate information and informed discretion. *See Williams v. Missouri Bd. of Probation & Parole, supra* at 925. We hold that, at the setting of minimum terms, minimum due process requires that an inmate be advised of adverse information in his or her parole file.

Allowing an inmate to inspect his or her file will have beneficial results. At the meeting between the inmate and the Board, it may expose claimed inaccuracies and prevent the Board from considering erroneous information. Likewise, it allows an inmate the opportunity to rebut or to explain adverse file information. Finally, it informs the inmate that the setting of minimum terms is open and fair, and it promotes the Board's goal of increased quality and rationality in its decision making.

We are aware, however, that the Board has other interests not advanced by disclosure. In 1977, the year in which

petitioners Sinka and Rowe received their minimum terms, the Board fixed 3,038 minimum terms for commitment offenses and parole revocations. Washington Human Resources Agencies, Annual Report 67 (1977). In 1978, it fixed 1,730 minimum terms. Washington Human Resources Agencies, Annual Report 61 (1978). Besides its responsibility of limiting the administrative cost of this large number of term settings, the Board is also responsible for preventing the release of information harmful to prisoners or others. *See* RCW 9.95.140.

The Board, therefore, is entitled to broad discretion in structuring a procedure for allowing inmates access to their files at the setting of their minimum terms. To this end, we recommend the federal parole hearing procedure in 28 C.F.R. § 2.55 (1978) for disclosure of records. This regulation allows an inmate to review reports and other documents in his or her file that will be considered at the hearing. Exceptions are made for:

(1) Diagnostic opinions which, if known to the prisoner, could lead to a serious disruption of his institutional program;

(2) Material which would reveal sources of information obtained upon a promise of confidentiality; or

(3) Any other information which, if disclosed, might result in harm, physical or otherwise, to any person. The term "otherwise" shall be deemed to include the legitimate privacy interests of such person under the Privacy Act of 1974.

28 C.F.R. § 2.55 (1978). If an exception is invoked, the file must contain a summary of the withheld material. This procedure is similar to the current procedure under our CrR 7.2(c) for disclosure of presentence investigation reports. *See also Williams v. Missouri Board of Probation & Parole, supra* at 924; Note *Prisoner Access to Parole Files: A Due Process Analysis, supra* at 272 n.90.

570

The cases of petitioners Sinka and Rowe are remanded to the Parole Board for proceedings that comply with this opinion.

UTTER, C.J., ROSELLINI, WRIGHT, HOROWITZ, DOLLIVER, HICKS, and WILLIAMS, JJ., and HUNTER, J. Pro Tem., concur.