[Nos. 31780-6-I; 31874-8-I.    Division One.    January 10, 1994.]

*In the Matter of the Personal Restraint of*
TODD TAPLEY, *Petitioner.*

*In the Matter of the Personal Restraint of*
DANIEL BRIXEY, *Petitioner.*

*Charles Rosenberry,* for petitioners.

*Christine O. Gregoire, Attorney General,* and *Richard A. McCartan, Assistant,* for respondent.

COLEMAN, J. — In a consolidated action, Todd Tapley and Daniel Brixey seek relief from personal restraint. They contend that the Green Hill School's policy for setting their release dates is unlawful because it violates (1) RCW 13.40-.210(1) and the Washington juvenile justice act, (2) equal protection, and (3) due process. We deny the petitions.

In 1991 and 1992, Todd Tapley and Daniel Brixey were each committed, respectively, as juveniles. Under the standard sentencing range, the Whatcom County Juvenile Court committed Tapley for 206 to 258 weeks, and the Spokane County Juvenile Court committed Brixey for 103 to 129 weeks. Tapley and Brixey were subsequently placed in the Green Hill School, which is a serious-offender juvenile correction facility operated by the Department of Social and Health Services (DSHS), Division of Juvenile Rehabilitation (DJR). Tapley began his DJR commitment on May 22, 1991. Under the terms of his sentence, Tapley's minimum release date is May 1, 1995, and his maximum is August 6, 1995. Brixey began his DJR commitment on April 6, 1992. Under the terms of his sentence, Brixey's minimum release date is March 3, 1994, and his maximum is September 1, 1994.

Upon entry to the Green Hill School, Tapley and Brixey were each assigned a release date based on the treatment behavior contract (TBC) method. Under this method, the juvenile and a counselor meet and sign a "contract", establishing individual treatment and behavior expectations. The initial release date is automatically set at the maximum, but the juvenile may work off days toward the minimum release date by complying with TBC expectations. The Green Hill staff then conducts periodic reviews, at least once every 4 months, in which they assess whether the TBC expectations are being met. If so, then a specified number of "credit days" may be awarded against the maximum release date. Any credit denied may be awarded during a subsequent review as a reward for good behavior. A juvenile with good behavior may be released at the minimum release date.

Of the five juvenile institutions in Washington, Green Hill is the only facility that uses the TBC method for setting release dates. The other facilities set a minimum release date shortly before the expiration of 60 percent of the minimum time already served. This release date determination is based on the juvenile's behavior up to that point.

In accordance with Green Hill policy, both Tapley and Brixey automatically received their maximum release dates. In each case, they met with a Green Hill counselor who indicated that a minimum release date was possible if their behavior expectations were met. In the subsequent review periods, Tapley received less than the total possible days that could be awarded.[1] Brixey similarly received less than the total possible days that could be awarded.[2] Both juveniles proceeded to file personal restraint petitions. Those petitions, which have been consolidated for purposes of review, challenge the Green Hill School's release policy on statutory and constitutional grounds.

■ To prevail on their personal restraint petitions, Tapley and Brixey must show by a preponderance of the evidence that a statutory or constitutional violation has caused them actual prejudice. *In re Powell*, 117 Wn.2d 175, 184, 814 P.2d 635 (1991) (citing *In re Cook*, 114 Wn.2d 802, 814, 792 P.2d 506 (1990); *In re Williams*, 111 Wn.2d 353, 364, 759 P.2d 436

---

[1]As of September 9, 1992, Tapley received five contract reviews and earned 26 days off of his maximum release date. In one review, Tapley earned 3 of 6 possible days toward his minimum. In another review, he earned 2 of 7 possible days toward his minimum. Tapley failed to receive the total number of days possible during these two reviews because the staff found tobacco and rubber cement in his room. The record is incomplete as to the other three reviews.

[2]As of August 25, 1992, Brixey received five contract reviews and earned 30 to 31 days off of his maximum release date. In the first two reviews, Brixey received the total possible days toward his minimum. The record is incomplete as to the days awarded in the third review. In his fourth review, Brixey received 6 of 9 possible days toward his minimum. In his fifth review, Brixey earned 4 of 9 possible days toward his minimum. Brixey failed to receive the total number of days possible during the last two reviews because he failed to clean his room and the staff found a tattoo gun, paint, and glue in his room.

(1988)). At present, it is highly questionable whether Tapley and Brixey can establish that they will be actually prejudiced as a result of the Green Hill policy.[3] As Green Hill indicates, it is still possible for Tapley and Brixey to meet their minimum. Specifically, if both juveniles conform to the facility rules and their behavior expectations, they may still be rewarded with previously denied days. Because, however, the question of prejudice cannot be determined until their release dates are conclusively established, we will consider their petitions on the merits.

We first determine whether the Green Hill release policy, which automatically sets a juvenile's release date at the maximum, is inconsistent with RCW 13.40.210(1) and the intent of the juvenile justice act.

After a convicted juvenile has been sentenced and then committed to the custody of DSHS, RCW 13.40.210(1) requires DSHS to set a release date within the standard range to which the juvenile has been committed. The sole restriction on that determination is that DSHS must set the release date prior to the expiration of 60 percent of the minimum term. RCW 13.40-.210(1). RCW 13.40.210(1) provides in pertinent part:

> The secretary shall . . . set a release or discharge date for each juvenile committed to its custody which shall be within the prescribed range to which a juvenile has been committed. Such dates shall be determined prior to the expiration of sixty percent of a juvenile's minimum term of confinement included within the prescribed range to which the juvenile has been committed.

Tapley and Brixey first argue that the automatic designation of a maximum release date is inconsistent with RCW 13.40.210(1) because it precludes the Green Hill staff from exercising discretion. Tapley and Brixey then argue that the automatic designation of a maximum release date also violates the Legislature's intent that juveniles receive individu-

---

[3]Petitioners argue at length that the Green Hill policy actually prejudices them because it shifts the burden of establishing a release date beyond the "presumed minimum" from DSHS to the juvenile. Because, however, we conclude later in this opinion that there is no presumed minimum, we must reject petitioners' claims of prejudice on this ground.

alized punishment and treatment. We find these arguments unpersuasive.

We initially note that RCW 13.40.210(1) requires only that the Department set a release date within the standard range prior to the expiration of 60 percent of the minimum term. Under the TBC method, Green Hill sets a release date when the juvenile first arrives. The timing of this release date determination is therefore well within the 60 percent deadline.

As to how the particular release date should be determined, RCW 13.40.210(1) is silent. One can infer, however, from this provision that DSHS is empowered to exercise its discretion. Clearly, if DSHS automatically assigned a maximum release date to every juvenile entering the facility without any further consideration, then such a policy could be said to violate RCW 13.40.210(1). In this case, however, the Green Hill release policy is designed in such a way that the automatic designation of the maximum release date is not an arbitrary act. Rather, it is merely the starting point for a highly discretionary process in which the Green Hill staff must regularly evaluate each juvenile in determining the appropriate release date. It is therefore apparent that the Green Hill release policy requires the staff to exercise the degree of discretion contemplated by the Legislature under RCW 13.40.210(1).

Likewise, the Green Hill release policy is consistent with the two primary principles underlying the Juvenile Justice Act of 1977: rehabilitation and retribution. *See State v. Rice*, 98 Wn.2d 384, 393-94, 655 P.2d 1145 (1982), *rejected on other grounds in State v. Coria,* 120 Wn.2d 156, 839 P.2d 890 (1992). Contrary to petitioners' characterization of Green Hill's release policy, the TBC method is not simply an automatic mass offender processing approach.[4] Rather, the TBC

---

[4]*See, e.g., In re M.*, 3 Cal. 3d 16, 473 P.2d 737, 89 Cal. Rptr. 33 (1970) (directing release of juvenile who had been automatically detained prior to a jurisdictional hearing); *Paul D. v. Superior Court*, 158 Cal. App. 3d 838, 205 Cal. Rptr. 77 (1984) (holding that probation department abused its discretion by adhering to an automatic policy).

method is a complex program in which each juvenile is not only held accountable for his or her conduct during commitment, but where each juvenile is also empowered to participate in the designation of those individual behavior expectations to which he or she will be held. A juvenile's term of punishment therefore depends on that particular juvenile's control over the behavior expectations that he or she has defined. Significantly, consistent with the goal of rehabilitation, the program provides structure, consistency, and a system of reward based on good behavior. These aspects of the program are positive influences that might otherwise be missing in the lives of many Green Hill juveniles.

Thus, Tapley and Brixey are not victims of an inflexible process that automatically deprives them of the opportunity to be released at the minimum. Rather, they are participating in a highly discretionary process which presumes that they will reach the minimum as long as they conform to their own personally defined behavior expectations. We therefore conclude that the Green Hill release policy, which automatically sets a juvenile's release date at the maximum, is not inconsistent with RCW 13.40.210(1) or the intent of the Juvenile Justice Act of 1977.

We next determine whether Green Hill deprived Tapley and Brixey of the right to procedural due process when it set their release dates at the maximum without a formal administrative review.

DJR Bulletin 10 (Nov. 1988) is a DSHS policy guideline that outlines the procedures to be used for implementing RCW 13.40.210(1). Bulletin 10 provides that release dates must be established prior to the expiration of 60 percent of the minimum term, and where that deadline passes without any release date determination, the minimum release date becomes the established release date. DJR bulletin para. 200(1). The bulletin goes on to provide that a "review" is required when the release date is set beyond the minimum term. DJR bulletin para. 200(2).

Tapley and Brixey claim that under DJR bulletin paras. 200(1) and (2), the juveniles at Green Hill have an expecta-

tion that they will be released at their minimum. They contend that they were deprived of this expectation when Green Hill automatically set their release dates at the maximum without a formal administrative review and reasons supporting the action.

In support, Tapley and Brixey cite *In re Sinka*, 92 Wn.2d 555, 599 P.2d 1275 (1979). There, the issue before our Supreme Court was whether two adult prison inmates were entitled to procedural due process in the setting of their minimum prison terms by the State Indeterminate Sentence Review Board. *Sinka*, at 556. In addressing this issue, the court found that the prisoners were, in fact, entitled to minimal due process in light of a state statute requiring the setting of minimum terms and a Board-adopted set of guidelines for fixing minimum terms. *Sinka*, at 564. In particular, the court stated that the Indeterminate Sentence Review Board policy had created an expectation that, unless the prisoner's case was extraordinary, the guidelines would be applied in setting the minimum term. *Sinka*, at 564. The court therefore held that if a prisoner's minimum is set outside the guidelines, then that prisoner is entitled to minimum procedural due process safeguards. *Sinka*, at 564-65.

Thus, while a prisoner generally has no constitutional liberty "right" to release prior to serving his or her maximum sentence, *In re Powell*, 117 Wn.2d 175, 201-02, 814 P.2d 635 (1991) (citing *Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1, 7, 60 L. Ed. 2d 668, 99 S. Ct. 2100 (1979)), cases like *Sinka* recognize that where a government agency has, by its own regulations, created such an expectation, that expectation must be honored through the protection of due process. *Sinka*, at 564; *see In re Ayers*, 105 Wn.2d 161, 167-68, 713 P.2d 88 (1986) (finding that Indeterminate Sentence Review Board regulations created expectation in potential for parole). In the present case, however, we find that unlike *Sinka*, the DJR policy guidelines do not create an expectation or protected interest in being released at the minimum.

In particular, the first policy provision at issue, DJR bulletin para. 200(1), provides in pertinent part:

> *Release dates shall be established prior to 60 percent of the minimum term of commitment*
> Release dates shall be set prior to 60 percent of the aggregated minimum sentence, otherwise the minimum release date shall become the established release date.

The thrust of this provision is simply that a juvenile's release date must be set prior to a particular deadline. Therefore, as long as this deadline is met, a juvenile's release date may be set at the minimum, maximum, or anywhere in between. The only clear expectation created by DJR bulletin para. 200(1) is that a failure to meet this deadline entitles a juvenile to his or her minimum release date.

The second policy provision, DJR bulletin para. 200(2), is more problematic. It provides as follows:

> *A review is required when the release date is set beyond the minimum term*
> When consideration is being given to establishing a release date beyond the minimum, the juvenile is entitled to:
> a. notice of the date of review;
> b. the right to appear in person at the review;
> c. the right to inspect the files prior to the review;
> d. the right to be given reasons if the release date is set beyond the minimum..

Clearly, this provision contemplates some form of procedure in the setting of release dates beyond the minimum term. When read in its entirety, however, this provision does not create an expectation that a juvenile's release date will be set at the minimum in the absence of a formal administrative review. Rather, this provision simply provides a procedure whereby a juvenile is entitled to an opportunity to review the material being considered and to be told why a release date beyond the minimum is being established. DJR bulletin para. 200(2) is therefore entirely consistent with DJR bulletin para. 200(1), which authorizes DJR staff to set a juvenile's release date, in its discretion, anywhere from the minimum to the maximum.

Furthermore, when DJR bulletin para. 200(2) is read in light of another DJR Bulletin 10 policy provision, which does

create a protected interest, it is clear that there is no presumed minimum release date. DJR bulletin para. 200(3), for example, provides in pertinent part:

> *An administrative review is required to increase an established release date*
> If consideration is being given to extending an established release date, an administrative review shall be scheduled comprised of staff responsible for the juvenile's program and a neutral chairperson. In this event a youth is entitled to:
> a. written notice of a minimum of ten (10) days prior to the scheduled review of the reasons for considering the change to the release date. . . .
> b. opportunity to be heard in person and to present. witnesses and documentary evidence;
> c. a neutral review chairperson;
> d. the right to confront and question adverse witnesses unless the chairperson specifically finds good cause for not allowing confrontation;
> e. a written decision stating the reasons for extending the release date.

This provision, in contrast to DJR bulletin para. 200(2), clearly creates a reasonable expectation that a juvenile will be released at the *established* release date. Therefore, if DJR attempts to extend this date, thereby depriving the juvenile of his or her liberty interest in an established release date, then the juvenile is entitled to a full administrative review with due process guaranties such as the right to be heard and the right to present witnesses and confront adverse witnesses.

Finally, the TBC method is not so inconsistent with the procedural requirements of DJR bulletin para. 200(2) to raise a colorable due process issue. Specifically, when a facility considers setting a juvenile's release date beyond the minimum, DJR bulletin para. 200(2) entitles the juvenile to notice, the right to be present, the right to examine the files or paperwork, and the right to reasons. Under the TBC method, these basic requirements, in addition to the other requirements imposed by DJR Bulletin 10, were met when Tapley and Brixey received their initial release dates:

First, the release date was set prior to the expiration of 60 percent of the minimum term.

Second, there was a review prior to the release date being set beyond the minimum term. In particular, both juveniles met with Green Hill counselors to establish the TBC and to discuss how the release date would be set. As previously stated, DJR bulletin para. 200(2) does not provide that a juvenile has the right to a formal process in which he or she has the opportunity to be heard, present witnesses and evidence, or cross-examine adverse witnesses. Rather, it is simply notice and a nonparticipatory provision that gives a juvenile the right to review the information and to be told why the release is being set in a particular way.

Third, Tapley and Brixey were told by the Green Hill counselors why the release date was being set at the maximum. The TBC contracts signed by Tapley and Brixey state:

> Offenders committed to DJR/Green Hill School, shall be eligible for time reduction equal to 100% of the difference between their court ordered minimum sentence and their court ordered maximum sentence. The time reduction for each sentence will be spread equally across the sentence. The resident will be reviewed periodically by the counselor and program committee who will award any time reduction for the review period. The awarding of time reduction will be documented on a Record of Official Action (ROA).

Fourth, by working with a counselor to establish individual behavior expectations, both juveniles participated in creating the paperwork that would comprise part of their individual files.

Fifth, each counselor documented the initial release date in a record of official action (ROA). The ROA submitted as to Tapley states:

> Todd received his maximum sentence release date with the opportunity to work toward his minimum release date by meeting the criteria established in his Treatment/Behavior Contract.

Similarly, the ROA submitted as to Brixey states:

> Dan will receive his maximum sentence with the opportunity to work down to his minimum release date. With maintaining a positive attitude towards his program, peers and staff he can work down to his minimum sentence.

Thus, from a practical perspective, the procedures used in implementing the TBC method can reasonably be construed as satisfying the requirements imposed by DJR Bulletin 10. And, even if it is assumed that the TBC method does deviate slightly from the requirements of DJR Bulletin 10, the element of harm is nevertheless very minimal given that its *essential* requirements are met. Indeed, as stated above, the primary purpose of DJR bulletin para. 200(2) is to inform the juvenile as to why his or her release date is being set beyond the minimum. Here, both Tapley and Brixey were told that their release dates were being set at the maximum and that if they met their behavior expectations, they could be released at their minimum. Thus, Tapley and Brixey were provided with reasons as to why their release dates were being set beyond the minimum. We therefore conclude that Tapley and Brixey were not deprived of their right to procedural due process.

■ ■ We last determine whether the Green Hill release date policy violates Tapley and Brixey's right to equal protection. The equal protection clause requires that similarly situated individuals receive like treatment under the law. *In re Whitesel*, 111 Wn.2d 621, 632-33, 763 P.2d 199 (1988) (quoting *Harmon v. McNutt*, 91 Wn.2d 126, 130, 587 P.2d 537 (1978); *Herriott v. Seattle*, 81 Wn.2d 48, 60, 500 P.2d 101 (1972)). To establish a violation of the equal protection clause, the petitioners must prove that there is no rational basis for differentiating them from a similarly situated class. *State v. Handley*, 115 Wn.2d 275, 290, 796 P.2d 1266 (1990) (citing *State v. Judge*, 100 Wn.2d 706, 713, 675 P.2d 219 (1984)).

Tapley and Brixey contend that the Green Hill juveniles are similarly situated to juveniles committed at other DJR institutions because they were all convicted of felonies, sentenced under the same statutory scheme, and subject to RCW 13.40.210 and DJR Bulletin 10. Despite being similarly situated, Tapley and Brixey claim that the TBC method unfairly discriminates against them. In particular, by setting their release date at the maximum, the Green Hill juveniles

are deprived of the procedural protections under DJR bulletin para. 200(2) that have been afforded to juveniles at other facilities.

■ Even assuming that petitioners have established membership in a class, we must reject their equal.protection claim in light of the fact that no showing of disparate treatment under the law has been established. While the manner by which Green Hill juveniles receive their initial release date differs from the approach taken at other facilities, Green Hill juveniles, nevertheless, are not penalized or treated differently from the juveniles at other facilities.

Rather, at all institutions, including Green Hill, a juvenile's behavior is determinative. That is, despite minor differences in procedure, all juveniles must earn their minimum release date through good behavior. Moreover, as stated above, DJR bulletin para. 200(2) does no more than provide that a juvenile is entitled to reasons why his or her release date is being set beyond the minimum term. Under either the Green Hill approach or the approach taken by other facilities, this requirement is met prior to the 60 percent deadline. Thus, despite having their initial release dates set at the maximum, Tapley and Brixey cannot show that they have been afforded any less protection under DJR bulletin para. 200(2) than those juveniles at other facilities.

The personal restraint petitions are denied.

WEBSTER, C.J., and AGID, J., concur.