# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of<br><br>TIMOTHY ROBERT PAULEY,<br><br>                    Petitioner. | No. 84523-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — The Indeterminate Sentencing Review Board (ISRB) found Timothy Pauley eligible for parole and set an eligibility release date. Pursuant to statutory authority, the governor issued an order canceling Pauley's parole. Pauley filed a personal restraint petition (PRP) seeking relief from the governor's order, alleging that the governor violated Pauley's due process rights. We hold the governor did not violate Pauley's due process rights either in making the order, or by engaging in an unfair process leading to the order. Accordingly, we deny Pauley's petition.

I

In 1981, Pauley pleaded guilty to three counts of murder in the first degree (counts III, IV, and V). He was sentenced to three maximum life terms. Under Washington's former indeterminate sentencing scheme, the trial court ordered the sentence for count IV to run first, then the sentences for counts III and V would run concurrent with each other and consecutive to count IV. The ISRB paroled Pauley on count IV in April 1999, after which he began serving the concurrent life sentences on counts III and V. Pauley's minimum term was adjusted by the ISRB

on several occasions. Following a hearing on March 16, 2022, the ISRB found Pauley parolable and set his parole eligibility release date on or about July 2, 2022.

The governor conducted a review of Pauley's parole order pursuant to RCW 9.95.160. The governor's review of the ISRB record included review of arguments made by Pauley and his attorney at the March 16, 2022 hearing. The governor and his staff also met with the victims and family members, as well as former King County Sheriff (and later member of the United States House of Representatives) David Reichert. Reichert had assisted with the investigation and arrest in Pauley's case as a homicide detective with the King County Sheriff's Office. Pauley's attorney wrote to the governor, and the governor's office acknowledged receipt of that letter. In addition, the governor's office invited Pauley's attorney to address whether the ISRB record showed "anywhere where Mr. Pauley has addressed the victims and/or their families and expressed his remorse." Pauley's attorney provided a response.

On May 18, 2022, the governor issued an order cancelling Pauley's parole. The order stated, "This factual statement and decision reasoning are based solely on materials included in the ISRB hearing record." The order acknowledges the ISRB record contains evidence of positive steps Pauley has taken towards rehabilitation, including the fact he has not received a serious infraction since 1995, or a general infraction since 2012, the fact he has maintained sobriety since 1995 and has successfully completed chemical dependency treatment, the fact Pauley has built strong pro-social community support and completed numerous self-help, education, and cognitive behavioral therapy programs and seminars, and a recent

psychological assessment indicating "he has made positive strides in his rehabilitation." The order states,

> Nevertheless, I am concerned by what is missing in Mr. Pauley's ISRB record. At his March 2022 ISRB hearing, Mr. Pauley was given the important opportunity to testify and offer his thoughts on how his behavior has impacted the victims and families of the victims. He expressed feeling ashamed for his "horrible" actions causing unimaginable problems. But in doing so Mr. Pauley distanced himself from his actions and the direct consequences of those actions. He spoke to the post-traumatic stress disorder [PTSD] that he suffered stemming from an earlier industrial accident and how he is ashamed that, through his crimes, he "passed that [PTSD] on to them [the victims]." He referred to the victims and their families as "them" and "these people," never directly acknowledging by name or apologizing to the victims and their families. This is troubling.
>
> Here, for Mr. Pauley's rehabilitation to be complete, he must engage in serious introspection to ultimately achieve and affirmatively demonstrate both a full acceptance of his responsibility and remorse. Absent this adequate showing of responsibility and remorse, I respectfully disagree with the ISRB and do not find that Mr. Pauley's rehabilitation is complete under RCW 9.95.100.
>
> Accordingly, I CANCEL the ISRB's decision to grant parole release to Mr. Pauley.

(Most alterations in original.)

Pauley filed this PRP, seeking relief from the governor's order, asserting it violates Pauley's due process rights because it relies on unsubstantiated notions rather than verified facts, and because the governor employed a constitutionally deficient process before issuing the order.

II

To obtain relief, Pauley must show he is restrained under RAP 16.4(b) and that his restraint is unlawful under RAP 16.4(c). In re Pers. Restraint of Lain, 179 Wn.2d 1, 10, 315 P.3d 455 (2013). RCW 9.95.160 provides "the governor may cancel or revoke the parole granted to any convicted person by the board. The

3

written order of the governor canceling or revoking such parole shall have the same force and effect and be executed in like manner as an order of the board." The statute places no statutory limits on the governor's discretion. Lain, 179 Wn.2d at 12-13. However, the governor's authority is not without limit. The governor's actions must comply with the constitutional due process protections afforded based on the liberty interest at stake. Id. at 17.

"[O]nce parole or a promise of parole has been granted in the form of a tentative release date . . . the prospective parolee enjoys a unique status and is deserving of minimal due process safeguards before cancellation of that date." Monohan v. Burdman, 84 Wn.2d 922, 929, 530 P.2d 334 (1975). For an inmate who was still incarcerated but has been granted a tentative release date, "due process was satisfied when [the inmate] had a hearing before the Board, the governor limited her review to that record, and the governor provided written reasons for her decisions." Lain, 179 Wn.2d at 17-18. "Where it is evident that the governor considered the evidence before the board and supported [the] decision with objective facts, it is not our role to reweigh the evidence and substitute our own discretionary judgment." Id. at 22. Consistent with judicial review of a decision of the ISRB, we review the governor's order to determine whether the governor "acted in total disregard of the facts." Id. at 21.

A

Pauley argues the order violated due process because it is based on the unsubstantiated notion that Pauley has not adequately expressed remorse, rather than on verifiable facts. Pauley argues his discussion of PTSD shows

4

"acknowledgment of the direct consequences of his actions," rather than distancing himself from his crimes. Pauley argues he expressed remorse, among other times, when he wrote the ISRB in 2012:

> I can't pretend to know how it must have felt for the families of my victims to have their loved ones so brutally snatched from them in the prime of life like I did, but since experiencing the loss of many of those dear to me and having missed my daughter's entire life, I at least began to gain some comprehension of how profoundly my actions have impacted those innocent people. I am deeply ashamed of what I've done and wish, more than anything I could somehow make this right. The fact I can never hope to do that haunts me every day.

And Pauley testified at his March 2022 hearing:

> I panicked. I, I couldn't get out of there fast enough. And as I was hurrying out towards the back door, I don't know why, but I opened up the cooler and I shot these two men. And I didn't even make it out the back door and I regretted that. I know all the harm I caused by doing that, but it was – I did it. I did it.

And, "I was in a state of panic, and I just reacted and did something that I've regretted every moment since then."

The governor's order noted factors showing rehabilitation, including Pauley's infraction record, sobriety, and recent psychological assessment indicating he "has made positive strides." At the same time, the governor observed that when Pauley was given an opportunity to offer his thoughts on how his behavior has impacted the victims and families of the victims at his March 2022 hearing, Pauley distanced himself from responsibility. When asked what he would say to people who thought he should not be released, Pauley testified, "There's nothing that I can do to provide comfort for these people. And I understand exactly why they feel that way. From my perspective, the thing that I would say to them is

that the laws that were in place when I pled guilty to my crime said that I would have been eligible for parole in 2007."

Pauley faults the governor's response to his PRP for relying, in part, on evidence from the distant past to support the governor's order. Pauley argues more recent rehabilitative efforts by him represent a factually accurate assessment of his current parolability. However, Pauley himself relies on equally historic evidence, such as pointing to his original guilty plea to support his acceptance of responsibility. More recently, Pauley engaged in a program in 2017 to help "make better decisions and also to have more empathy for different kinds of people," had a psychological evaluation in 2019, was discharged from substance use disorder treatment in 2021, and had another psychological evaluation in 2021. Contrary to Pauley's reply argument, the governor has pointed to Pauley's statements in the 2021 psychological evaluation as supporting the governor's discretionary assessment of his remorse. Those statements include references to having "panicked" at the time of the homicides, referring to lack of "capacity," and referring to his own industrial injury. Pauley's argument that the governor counterfactually overlooked more recent rehabilitation is not borne out by the record.

The record permitted the governor to conclude Pauley's rehabilitation was not complete. Like in Lain, the governor's order demonstrates that he "considered all the evidence presented to the Board, and [he] supported [his] decision . . . with objective facts." Lain, 179 Wn.2d at 21-22. Because "it is not our role to reweigh the evidence and substitute our own discretionary judgement," id. at 22, and the governor's reasoning is based on verifiable facts in the record, the governor's

6

conclusion that Pauley has not made an adequate showing of responsibility, remorse, and accountability was not "in total disregard of the facts," id. at 21.

B

Pauley argues the order violates his due process rights because it derived from an unfair process—"the Governor did not stick to the record before the ISRB. Instead, he reviewed extra-record and one-sided information, in the form of meeting with Congressman Reichert and some of the survivors of Mr. Pauley's crime as well as media-hyped contact from the public." Pauley states, "Because Mr. Pauley never had the opportunity to review or respond to the extra-record materials submitted [by advocates against his release] or . . . an equal opportunity to meet with the Governor, the resulting order violates due process."

We do not agree it violates due process for the governor to consider input both from Pauley and from victims, family members, and law enforcement involved in the prosecution. The court stated in Lain that due process was afforded in that case in part because the governor had limited review to the ISRB record. 179 Wn.2d at 17-18. We do not interpret that as implying that if the governor receives any other information, then a conclusion of a due process violation necessarily follows. In Lain, also, local news ran stories about the police officer victim's and the Lakewood Police Guild's opposition to Lain's release, and requested the governor review the case. Id. at 9-10. "The governor's office and the board received considerable correspondence from law enforcement support organizations and individuals objecting to Lain's parole." Id. at 10. Pauley submitted his position on how the governor should interpret the record. His

constitutional rights were not violated because those who participated in prosecuting him did so also. The governor's order states, "This factual statement and decision reasoning are based solely on materials included in the ISRB hearing record." Pauley provides no basis to question the fact the governor *did* substantively base his decision on the ISRB record.

Lain also rejected the argument that due process requires an in-person meeting with the governor. When discussing the value of additional procedures in preventing erroneous deprivations of liberty, the Court observed,

> Lain received a hearing before the [ISRB], where he had the opportunity and every incentive to present his best case for parolability. That hearing and the governor's limited review helped assure that the governor's discretionary decision was based on verified facts and informed by accurate knowledge of Lain's behavior, minimizing the risk that a determination about parolability was arbitrary and capricious. . . . Lain fails to identify anything meaningful that would be different in a second hearing before the governor.

Id. at 19. Lain argued that, had he been provided a hearing before the governor, "he would have presented favorable references, described his rehabilitative efforts, and shown his strong plan for release into the community." Id. at 20. The Court concluded, "Lain made these efforts before the [ISRB], and it was that record on which the governor relied in making her discretionary decision." Id.

The same is true here. Pauley asserts that if he had been provided a similar opportunity to meet with the governor, he "could have assured the [g]overnor of the sincerity of his regret and remorse as well as his full acceptance of responsibility." Pauley had a hearing before the ISRB where he had notice and incentive to present his best case for parolability, including expressions of remorse.

The families of two of Pauley's victims had been engaging with the ISRB regarding Pauley's case since "about October 2014," and the ISRB decision and reasoning from a 2016 hearing states that members of the media and community were present. At the March 2022 hearing, a member of the ISRB invited Pauley to address specifically people who thought he should never get out despite his efforts at rehabilitation. An in-person meeting with the governor would duplicate the procedure Pauley was afforded before the ISRB.

Pauley also argues that because he was not afforded an opportunity to review the materials survivors submitted to the governor, he was deprived of an opportunity to ensure their accuracy, and was thereby deprived of due process. Pauley asserts the documents provided to the governor by the victims and family members were not part of the ISRB record. Pauley relies on In re Pers. Restraint of Sinka, 92 Wn.2d 555, 557-58, 599 P.2d 1275 (1979), in which two petitioners did not have access to their ISRB files when they met with board members for setting their minimum terms. Both petitioners complained the ISRB's decision to set their terms outside the guideline ranges resulted from inaccuracies in the files. Id. at 566. The court stated, "We believe that '(s)ince the data on which the [ISRB] acts is not developed through an open adversary confrontation, its accuracy cannot be assured unless the prisoner has access to the relevant information in his file.'" Id. (quoting Franklin v. Shields, 569 F.2d 784, 794-95 (4th Cir. 1977)). Sinka held, "[A]t the setting of minimum terms, minimum due process requires that an inmate be advised of adverse information in his or her parole file." Id. at 568. Pauley contends he obtained the victims' and family members' submissions

9

through public records requests only after the governor's order. But despite his actually having reviewed those submissions after the fact, he points to no way in which they are inaccurate or in which they differ from the position the victims, family members, and law enforcement have long taken in Pauley's case. Pauley does not show the governor's order relied on matter extrinsic to the ISRB record.

Because Pauley had an opportunity to make his best case for parolability before the ISRB, and the governor relied on the ISRB record in making his discretionary decision, Pauley received the process he was due to protect his limited liberty interest in his parole release date. Pauley has not shown that his restraint is unlawful. We deny the petition.

_Birk, J._

WE CONCUR:

_Chung, J._        _Mann, J._